# Exhibit G

## OPERATING AGREEMENT OF RCL SERVICES, LLC

THIS OPERATING AGREEMENT (the "Agreement") of RCL SERVICES, LLC is effective March 1, 2021, by and between Rieder Noram, Inc. a Delaware corporation ("RNA"), and Centerline Architectural Supply, LLC, a Wisconsin limited liability company having an address at N. 3840 2nd St. Weyerhaeuser, WI 54895 ("Centerline"). As used herein, each of RNA and Centerline is a "Member" and together they are the "Members").

## RECITALS

RNA is an affiliate of Rieder Overseas GmbH ("Parent"), a global innovator of building products;

Centerline is engaged in the business of fabricating products for the construction industry and has the equipment and labor to use in the fabrication of building products, as well as a protected list of vendors to supply complex wall assemblies and services therein;

RNA and Centerline are forming the Company as a limited liability company under the Delaware Limited Liability Company Act (the "Act") pursuant to a Certificate of Formation filed with the Office of the Secretary of State of the State of Delaware on March 1, 2021 to establish a company that will design, fabricate and sell building products licensed from Parent (the "Products");

The right of the Company with respect to the Products are subject to the terms of that certain license agreement between RNA and the Company in the form attached as Exhibit A (the "License"), the terms of which are incorporate herein;

RNA and Centerline wish to set out fully their respective rights, obligations, and duties with respect to the Company and its assets in this Agreement, which is the limited liability company agreement required under Section 18-201(d) of the Act, and pursuant to such section is effective as of the formation of the Company; and

The defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in Schedule 1.

NOW THEREFORE, for consideration of the mutual provisions and agreements made herein, the Members, intending to be legally bound, agree as follows:

## ARTICLE 1
## THE COMPANY

1.1    Formation. The Company has been formed as a limited liability company pursuant to the provisions of the Act for the purposes set forth in this Agreement. The name of the Company is RCL Services, LLC.

1.2    Purpose. The purpose of the Company is to establish a business for the



design, fabrication, services and system of the Products and to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the foregoing purpose.

    1.3   <u>No General Agent</u>. Except as otherwise provided in this Agreement or any other agreement between the Members, the Members may enter into any other venture or business activity of any nature or description, independently or with others. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to participate in or to share in such other ventures or activities, or to the income or proceeds derived therefrom. This provision is subject to the License.

    1.4   <u>Business Location</u>. The principal place of business of the Company shall be located initially at Ladysmith, Wisconsin, and may be relocated to Ladysmith, Wisconsin. The Board of Managers may, at any time, change the location of the Company's principal place of business, establish additional offices and places of business and change the registered agent and registered office of the Company and upon any such change shall give prompt notice to each Member of such change.

    1.5   <u>Term</u>. The Company shall continue in full force and effect until terminated pursuant to <u>Article 8</u>.

    1.6   <u>Title to Company Property</u>. All property originally transferred into the Company or subsequently acquired by purchase with Company funds or otherwise shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property.

    1.7   <u>Filings</u>. The Company shall exist under and be governed by the laws of the State of Delaware. The Board of Managers shall promptly make such filings as it believes necessary or as required by applicable law to give effect to the provisions of this Agreement and to cause the Company to be treated as a limited liability company under the laws of the State of Delaware.

**ARTICLE 2**
**MEMBERS**

    2.1   <u>Members</u>. Each Member's ownership interest in the Company shall be represented by Units and expressed as a Percentage Interest. The name and address of each Member, the number and class of Units held by each Member and its Percentage Interest are set forth on <u>Schedule 2</u> hereto, as the same may be amended from time to time in accordance with the terms hereof. Any Member will cease to be a Member when such person ceases to own any Units. Each Member shall make a Capital Contribution to the Company in exchange for the Units granted, as set forth on <u>Schedule 2</u>.

    2.2   <u>Powers of the Members</u>. Except as specifically provided herein, the Members shall have no power or authority to act for or on behalf of or to bind the Company.

    2.3   <u>Admission of New Members</u>. The Company shall admit no additional Members

2

  

without the approval of the Board of Managers. No assignee of a Member's Units permitted under this Agreement or otherwise permitted by the Board of Managers (a "Permitted Assignee") shall have the right to be admitted as a Substitute Member in place of its assignor, unless:

(a)    the assignor agrees in writing satisfactory to the Board of Managers the intention that the assignee is to become a Substitute Member;

(b)    the Permitted Assignee shall agree in writing to be bound by all of the terms of this Agreement in its capacity as a Substitute Member;

(c)    the Permitted Assignee shall execute and/or deliver such instruments as the Board of Managers deems necessary or desirable to effect such assignee's admission as a Substitute Member and to evidence acceptance of the terms of this Agreement; and

(d)    the Permitted Assignee shall pay all reasonable expenses in connection with the admission as a Substitute Member.

2.4    <u>Rights of Assignees</u>.  An assignee who does not become a Substitute Member shall succeed only to the rights of his or her assignor to receive distributions from the Company.  No assignee may participate in the management of the Company or have any voting rights.

2.5    <u>Meetings of the Members</u>.  The Members shall meet at least two (2) times per calendar year to review the operations and financial condition of the Company.  Meetings may be held at the principal place of business of the Company, at such other place agreed by the Members, or by telephone or video conference.  Notice of such meeting shall be provided to each Member at least ten (10) business days in advance, provided that any Member may waive such notice requirement.

2.6    <u>Voting</u>.  The Members shall not have any right to vote on any matters unless provided in this Agreement.  For any action requiring the Member Consent, a vote shall be taken in which each Member shall have that number of votes equal to the number of Units held by such Member.  Any action requiring Member Consent may be taken (a) at a meeting at which all Members are present, or (b) by written instrument signed prior to the taking of such action, by those Members whose consent is required to approve such action.  Any meeting of the Members may be held at the principal office of the Company or by conference telephone so long as all Members participating in the meeting can hear one another.  Members participating by telephone or similar equipment shall be deemed present in person at the meeting.

2.7    <u>Exclusion</u>.  Unless admitted to the Company as a Member pursuant to and in accordance with this Agreement, no person shall be, or be treated as, a Member.  The Company may elect to deal only with persons so admitted as Members (including their duly authorized representatives).  The Company shall not be required to deal with any other person merely because of an assignment or transfer of Units to such person (other than with respect to distributions to assignees pursuant to assignments in compliance with Section 2.4); <u>provided</u> that any distribution by the Company to the person shown on the Company's records as a Member or to its legal representatives or to the assignee of the right to receive the Company distributions as provided

3

  

herein shall relieve the Company of all liability to any other person who may be interested in such distribution by reason of any other assignment by the Member, or for any other reason.

2.8    <u>Withdrawal</u>.  No Member may withdraw from the Company except and to the extent provided by this Agreement.

2.9    <u>Transfer of Units</u>.  No Member shall have the right to Transfer any Units unless the Board of Managers provides its prior written consent to such Transfer, which consent may be provided or denied in the Board of Managers' sole discretion.  Each Member acknowledges the reasonableness of the restrictions on Transfer of Units imposed by this Agreement, and the restrictions on Transfer shall be specifically enforceable.

2.10    <u>Liability of the Members</u>.  In no event shall any Member, in its capacity as a Member, be personally liable for any liabilities or obligations of the Company.

2.11    <u>Representations and Warranties of Members</u>.  Each Member represents, warrants and covenants that such Member: (a) is in good standing, is fully authorized to enter into this Agreement, and has all licenses, permits, prequalifications, and other governmental consents necessary to conduct its business; (b) is capable of performing its obligations under this Agreement; (c) will promptly satisfy its obligations under this Agreement; and (d) will comply with all laws applicable to its operations, including, but not limited to, those governing discrimination in employment, employee health and safety, hazardous wastes and substances, the discharge of contaminants into the environment, restraint of trade, bribery and gratuities involving public officials, and government contract fraud.

**ARTICLE THREE**
**MANAGEMENT**

3.1    <u>Board of Managers</u>.

(a)    The daily business and affairs of the Company will be managed by or under the direction of a board of managers (the "Board of Managers") consisting of two (2) representatives (each, a "Manager") named by each party, and Wolfgang Rieder as the chair (the "Chair").  As used herein, the Board of Managers means the Managers and the Chair, and each Manager and the Chair is a "Manager" under this Agreement (with all voting rights) and for purposes of the Act. The Board of Managers has the authority to act for and bind the Company.

(b)    Each Manager shall have one (1) vote.  Each Manager shall have full authority to act on behalf of the Member which appointed such Manager.  Each Manager will serve on the Board of Managers until his or her successor is appointed or until his or her earlier death, resignation, or removal.  Only the Member who appointed the Manager may remove or replace such Manager, provided that a Manager shall be removed by the Company for Cause.

(c)    Until written notice of any change is given as hereinafter provided, the Managers appointed by each Member are as follows:

4





RNA Managers:          Frank Wagenbauer and Angelika Rieder
Centerline Managers:   JR Hughes and Kyle Czekalski

(d)    The Company shall not pay a salary to a Manager, but the Company shall reimburse reasonable business expenses of the Board of Managers.

(e)    Each Member may change its Manager at any time by giving written notice of such change to the other Member.  If the Chair ceases to serve for any reason, he shall be replaced by a person appointed by RNA with agreement of the majority of the Board of Managers.

3.2    <u>Authority</u>.  The Board of Managers has the authority to make decisions, commitments, agreements, understandings and all other matters pertaining to the business of the Company.  The Board of Managers shall have power and authority to supervise and control the Company and its Officers, and to exercise control and make decisions on general policy matters related to the Company which are not specifically delegated to the officers, approve the amount of working capital required by the Company, the requirements and plans for the acquisition of any equipment or major material items and the distribution of profits earned, and receive and review reports on the business from the officers.  Without limiting the foregoing, the following actions require the approval of the majority of the Managers:

(a)    Approval or dismissal of officers and other management level employees;

(b)    Approval of any consultants or subcontractors performing services or providing materials for the Company;

(c)    Bonding requirements, surety agreements and indemnity agreements;

(d)    Signature authority for the Account;

(e)    Authorizing change orders, releases and settlements relating to the fabrication of the Products;

(f)    Approval of expenditures set forth on the Budget (as defined below) so long as such expenditures do not exceed the budgeted amount by more than 20%;

(g)    Distribution of funds to any Member, including tax distributions;

(h)    Approval of capital contributions from each Member;

(i)    Selection of legal counsel and accountants for the Company;

(j)    Commencement of legal proceedings by the Company against any person, and the resolution or settlement of such proceedings; and

5

  

(k)    Allocation of marketing costs between the Company and its affiliates, provided that the allocation shall be based on the revenue split between such companies in 2021 and thereafter by 60/40 split in the following years.

Nothing herein shall preclude the Board of Managers from adopting policies or procedures for the operations of the Company or delegating responsibility to officers.

3.3    <u>Matters Requiring Unanimous Approval</u>.  Notwithstanding the provisions of this Agreement, the following matters may be authorized only by the unanimous vote or consent of the Managers:

(a)    Amendment of this Agreement;

(b)    Purchasing or disposing of any capital asset or making any expenditure having a value of $500,000 or more;

(c)    Borrowing from any source, and any pledge, mortgage or other encumbrance of the Company or its assets;

(d)    Approval of the annual budget for the Company (the "Budget"), which shall be agreed to on or before January 1 each year, and approval of any expenditures not contained in the Budget or the cost of which exceeds the Budget by more than 20%;

(e)    Sale of substantially all of the assets of the Company (other than the License), or the merger or consolidation of the Company with or into another entity; and

(f)    Dissolution of the Company.

3.4    <u>Matters Reserved to RNA</u>.  Notwithstanding the provisions of this Agreement, including but not limited to Sections 3.2 and 3.3, RNA shall have the sole authority to determine:

(a)    Insurance coverage, procurement and limits;

(b)    The manner by which the Company shall resolve any warranty, design or defect claims relating to the Products;

(c)    Product development matters; and

(d)    All matters relating to the License.

3.5    <u>Meetings of the Board of Managers</u>.

(a)    Meetings of the Board of Managers shall be held as necessary or as requested by each Member, provided that the Board of Managers shall meet at least twice per year.  In addition, any officer of the Company may call a special meeting of the Board of Managers at any time by giving written or telephone notice at least two (2) days prior to the meeting, unless such period of





notice is reduced or waived by the Board of Managers.  Meeting may be held at the Company's office or by conference call or similar communication.  The Board of Managers shall consider any matters submitted by any of the Representatives, the Chair or the officers.

(b)    For any meeting of the Board of Managers, a quorum shall be comprised of at least one Manager of appointed by each Member.  Each Manager will have one vote on the Board of Managers.  A resolution in writing, signed by a majority of the Board of Managers, shall be as valid as if it had been passed at a meeting of the Board of Managers.  Unless otherwise expressly provided herein, all decisions, determinations, approvals, consents or other actions shall be determined by the majority vote of the Board of Managers.

3.6    <u>Minutes</u>.  At each meeting, the Board of Managers shall appoint one of its members to take minutes of such meeting and provide prompt and accurate minutes to the Board of Managers.  The minutes of meetings shall be deemed approved no one objects to the minutes within fourteen (14) days after dissemination.

3.7    <u>Written Consent</u>.  The Board of Managers may make decisions without a meeting being held provided that the Board of Managers give its unanimous consent in writing.  Any action by written consent shall be documented and maintained with the records of the Company.

3.8    <u>Officers</u>.    The Board of Managers shall appoint one or more officers (the "Officers") of the Company, including a President, Vice President, Chief Operating Officer and Chief Executive Officer.    The Officers shall have the duties and obligations set forth on <u>Schedule 3</u>.  The Officers shall be responsible for and supervise the business and affairs of the Company, subject to the authority of the Board of Managers and the terms of this Agreement.  The Officers shall not be changed without the consent of the Board of Managers.  The Officers shall report to and be subject to the overall control, management and direction of the Board of Managers.

3.9    <u>Duties and Responsibilities; Reports</u>.    The Board of Managers may adopt resolutions from time to time that detail the specific rights and responsibilities of each Officer.  Without limiting the foregoing, the Officers shall be responsible for providing the following reporting to the Board of Managers:

(a)    Monthly progress and cost monitoring report showing the status of the Company's operations against budget with commentary on planned approach to improving negative variances;

(b)    Cost to complete and job profitability analysis;

(c)    Status of all disputes, claims and update on strategy relative thereto;

(d)    Quality assurance and safety program compliance;

(e)    Evidence of the payment of all withholding taxes and insurance premiums for all personnel employed by the Company; and

7

  

(f)      Any other information required by the Board of Managers.

3.10    <u>Standard of Conduct</u>.  Each Manager and the Officers will discharge his or her duties in the best interests of the Company, in good faith with the care an ordinarily prudent person in a like position would exercise under similar circumstances in reliance on the provisions of this Agreement, and without intentional misconduct or a knowing violation of law.  No Manager or Officer shall enter into any transaction for which such person receives a personal benefit in violation of this Agreement, provided that a Manager or Officer does not violate a duty or obligation under this Agreement because the person's conduct furthers the interest of a Member.

3.11    <u>Management of the Business</u>.  Subject to the terms and conditions of this Agreement, in general RNA will be responsible for finance and information technology matters and will lead the ERP implementation, and Centerline will be responsible for operational issues and coordination of the workforce.  Notwithstanding the foregoing, the Members will coordinate their efforts with each other.  The business case attached as <u>Exhibit A</u> shall guide the Members in establishing the Company's operations.  Prices for the Products and commissions for sales representatives will be determined by the Board of Managers annually.

## ARTICLE FOUR
## ALLOCATIONS AND DISTRIBUTIONS

4.1    <u>Profits and Losses.</u>  Except as otherwise hereinafter provided, including without limitation the provisions of Section 4.3, the Profit or the Loss, as the case may be, as of the end of any relevant fiscal period of the Company shall be allocated among the Members as follows:

(a)      Profits.  For any relevant fiscal period in which the Company has a Profit, such Profit shall be allocated among the Members in the following order and priority

(i)      First, among the Members in proportion to and in the reverse order to which any net Losses were allocated to them pursuant to Section 4.1(b) until the cumulative net Profits allocated pursuant to this Section 0 equal the cumulative net Losses allocated pursuant to Section 4.1(b); and

(ii)      The balance, if any, of the Profit shall be allocated among the Members in proportion to their respective Percentage Interests.

(b)      Loss.  For any relevant fiscal period in which the Company has a Loss, such Loss shall be allocated among the Members in the following order and priority:

(i)      First, among the Members in proportion to and in the reverse order to which any net Profits were allocated to them pursuant to Section 4.1(a) until the cumulative net Losses allocated pursuant to this Section 4.1(b)(1) equal the cumulative net Profits allocated pursuant to Section 4.1(a); and

(ii)      The balance, if any, of the Loss shall be allocated among the Members in

8



proportion to their respective Percentage Interests.

4.2    <u>Distributions</u>.

(a)    Tax Distributions.  The Board of Managers shall cause the Company to make distributions to the Members on or before the due date of quarterly installment tax payments and in amounts intended to assist the Members in satisfying their income tax liability attributable to allocations of taxable income of the Company allocated to them in any Fiscal Year (a "Tax Distribution").  In determining the amount of any Tax Distribution, the Board of Managers may assume that the items of taxable income, gain, deduction, loss and credit in respect of the Company are the only such items entering into the computation of tax liability of the Members for the Fiscal Year and that each Member is subject to tax at the same effective tax rate, which shall be determined by the Board of Managers.  In addition, the Board of Managers may take into account prior distributions made to the Members under this Agreement with respect to such Fiscal Year and prior allocations of net losses (in excess of prior allocations of net income) made to the Members by the Company in any period, and the Board of Managers may make reasonable assumptions regarding the varying tax rate applicable to different categories of taxable income and loss and to different tax years in which taxable income or loss is recognized.  Tax Distributions made pursuant to this Section 4.2(a) to any Member shall be treated as advances against future distributions that otherwise would be made to such Member and therefore shall reduce the amount of such future distribution dollar for dollar.

(b)    Net Distributable Cash.  Other than as set forth in Section 4.2(c), the Board of Managers shall also cause distribution to be made of Net Distributable Cash at such times, and in such amounts, as the Board of Managers determines from time to time.  Distributions of Net Distributable Cash under this Section 4.2(b) shall be made to the Members in proportion to their Percentage Interests.

(c)    Dissolution Transactions.  Proceeds from a Dissolution Transaction, and after payment of, or adequate provision for, the debts and obligations of the Company, and liquidation of any remaining assets of the Company, shall be distributed and applied in the following priority:

(i)    to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by the Board of Managers, provided that, upon the expiration of such period of time as the Board of Managers shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section 4.2(c);

(ii)    the balance to the Members in accordance with Members' positive Capital Accounts; and

(iii)    Distribution of cash or property to the Members in accordance with the provisions of this Section 4.2(c) shall constitute a complete return to the Members of their respective interests in the Company assets.  Each Member shall look solely to the assets of the Company for the return of its investment in the Company, and it shall have no recourse against any member of the Board of Managers or any Member if the net assets of the

  

Company remaining for distribution as hereinabove provided are insufficient to return its investment.

(d)    Distribution In-Kind.  If any assets of the Company shall be distributed in kind, such assets shall be distributed to the Member(s) entitled thereto as tenants-in-common in the same proportions as such Member(s) would have been entitled to cash distributions as if (i) such assets had been sold for cash by the Company at the fair market value of such property (taking Code Section 7701(g) into account) on the date of distribution; (ii) any unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) that would be realized by the Company from such sale were allocated among the Member(s); and (iii) the cash proceeds were distributed to the Member(s) in accordance with this Section (ii).  The Capital Accounts of the Member(s) shall be increased by the amount of any unrealized income or gain inherent in such property or decreased by the amount of any loss or deduction inherent in such property that would be allocable to them, and shall be reduced by the fair market value of the assets distributed to them under the preceding sentence.

4.3    Regulatory Allocations.

(a)    *Limitation on and Reallocation of Losses*.  At no time shall any allocations of Losses, or any item of loss or deduction, be made to a Member if and to the extent such allocation would cause such Member to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Member at the end of any Fiscal Year.  To the extent any Losses or items are not allocated to one or more Members pursuant to the preceding sentence, such Losses shall be allocated to the Members to which such losses or items may be allocated without violation of this Section 4.3(a).

(b)    *Minimum Gain Chargeback*.  If there is a net decrease in Company Minimum Gain during a Fiscal Year so that an allocation is required by Treasury Regulations Section 1.704-2(f), each Member shall be specially allocated items of income and gain for such year (and, if necessary, subsequent Fiscal Years) equal to such Member's share of the net decrease in Company Minimum Gain as determined by Treasury Regulations Section 1.704-2(g).  Such allocations shall be made in a manner and at a time which will satisfy the minimum gain chargeback requirements of Treasury Regulations Section 1.704-2(f) and this Section 4.3(b) shall be interpreted consistently therewith.

(c)    *Nonrecourse Deductions*.  Nonrecourse Deductions for any Fiscal Year or other period (not including any Member Nonrecourse Deductions allocated pursuant to Section 4.3(e)) shall be allocated among the Members in proportion to their respective Percentage Interests.

(d)    *Excess Nonrecourse Liabilities*.  Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company profits shall be equal to his, her or its Percentage Interest.

(e)    *Member Nonrecourse Deductions*.    Any Member Nonrecourse Deductions attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be allocated to

10

  

the Member who bears the economic risk of loss with respect to the liability (within the meaning of Treasury Regulations Section 1.752-2) in accordance with Treasury Regulations Section 1.704-2(i)(1).

(f)    *Member Minimum Gain Chargeback*.    If there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, then each Member who has a share of such Member Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of income and gain of the Company, determined in accordance with Treasury Regulations Section 1.704-2(j)(2)(ii), for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to each such Member's share of the net decrease in such Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Treasury Regulations Section 1.704-2(i)(4).

(g)    *Qualified Income Offset*.    If any Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be specially allocated to all such Members in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Treasury Regulations Section 1.704-l(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Member, provided that an allocation pursuant to this Section 4.3(g) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.3(g) were not included herein.

(h)    *Basis Adjustment*.    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to either of Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

Section 4.4    Curative Allocations.    The allocations set forth in Section 4.3 (collectively the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-l and 1.704-2 and shall be interpreted consistently therewith.  To the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other Profits, Losses, and items of Company income, gain, loss, or deduction pursuant to this Section 4.4.  Therefore, notwithstanding any other provision of this Article 4 (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company Profits, Losses and items of income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not in effect.  In exercising its discretion under this Section 4.4, the Board of Managers shall take into account future Regulatory Allocations that, although net yet made, are likely to offset other Regulatory Allocations previously made.

11

  

Section 4.5    Tax and Book Allocations.

(a)    Except as otherwise provided in this Section 4.5, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated as provided in Section 4.1.

(b)    Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code Section 704(c) and the related Treasury Regulations under Code Sections 704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Book Value at the time of its contribution to the Company.  Such allocation shall be made by the Board of Managers in any manner which is permissible under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    If the Book Value of any Company property is adjusted, pursuant to paragraph (ii) or (iv) of the definition of "Book Value" contained in Section 8 hereof, then subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using any permitted method under Code Section 704(c) and the Treasury Regulations thereunder as determined by the Board of Managers.  In the event that the Capital Accounts of the Members are so adjusted to reflect revaluations of the Company's property, (i) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, and (ii) the amount of upward and/or downward adjustments to the Book Value of the Company property shall be treated as income, gain, deduction and loss for purposes of applying the allocation provisions of this Article 4.  In the event that Code Section 704(c) applies to any property of the Company, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property.

Section 4.6    Other Allocation Rules.

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.  Except as otherwise provided herein, all items of income, gain, loss, and deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses for such Fiscal Year.

(b)    If the Percentage Interest of any Member changes during any year, whether by reason of the grant or issuance of additional Units in the Company, transfers of Units in the Company, distributions from Capital Accounts or otherwise, the allocations prescribed by the



DocuSign Envelope ID: 2ED3039B-464C-4D53-9E8A-2EE5E2F2F06E

Article 4 shall be based upon an interim closing of the Company's books at the time of any such change; provided, however, that the Board of Managers may utilize any other method permitted under Section 706 of the Code and the Treasury Regulations promulgated thereunder if an interim closing of the books with respect to any item of income or expense, or any other item, would be impracticable or inequitable.

      Section 4.7    <u>Tax Withholding</u>.  The Company shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold from a distribution otherwise payable to such Member or with respect to amounts allocable to such Member or to make any other payments to any governmental authority with respect to any foreign, federal, state or local tax or withholding liability arising as a result of such Member's interest in the Company (a "Withholding Payment").  Any Withholding Payment made from funds withheld upon a distribution will be treated as distributed to such Member for all purposes of this Agreement.  Any "imputed underpayment" within the meaning of Code Section 6225 paid (or payable) by the Company as a result of an adjustment with respect to any Company item, including any interest or penalties with respect to any such adjustment (collectively, an "Imputed Underpayment Amount"), shall be treated as if it were paid by the Company as a Withholding Payment with respect to the appropriate Members.  The Board of Managers shall reasonably determine the portion of an Imputed Underpayment Amount attributable to each Member or former Member.  The portion of the Imputed Underpayment Amount that the Board of Managers attributes to a Member shall be treated as a Withholding Payment with respect to such Member.  The portion of the Imputed Underpayment Amount that the Board of Managers attributes to a former Member of the Company shall be treated as a Withholding Payment with respect to both such former Member and such former Member's transferee(s) or assignee(s), as applicable, and the Board of Managers may in its discretion exercise the Company's rights pursuant to this Section in respect of either or both of the former Member and its transferee or assignee.  Imputed Underpayment Amounts treated as Withholding Payments also shall include any imputed underpayment within the meaning of Code Section 6225 paid (or payable) by any entity treated as a partnership for U.S. federal income tax purposes in which the Company holds (or has held) a direct or indirect interest other than through entities treated as corporations for U.S. federal income tax purposes to the extent that the Company bears the economic burden of such amounts, whether by law or agreement.

**ARTICLE FIVE**
**BOOKS AND RECORDS; TAX MATTERS**

      5.1    <u>Books and Records</u>.  The books and records of the Company shall be maintained by the Board of Managers and made available, in addition to the records and documents required to be kept under the Act, at the office of the Company required under the Act.  All such books, records and documents shall be available at such office for inspection by any Member or the Member's authorized representative, at any reasonable time during ordinary business hours for any purpose reasonably related to the Member's interest in the Company.  Those records and documents required to be kept by the Act shall be available at such office for inspection and copying by any Member or the Member's authorized representative, at the reasonable request of and at the expense of the Member, during ordinary business hours.

13





5.2    <u>Accounting and Fiscal Year</u>.    The books of the Company shall be kept in accordance with such accounting methods as the Board of Managers shall determine is appropriate.  The Company's books shall be closed and balanced at the end of each Fiscal Year and at such other times as the Board of Managers may determine appropriate.

5.3    <u>Reports</u>.  The Board of Managers shall deliver to each person who was a Member at any time during the Fiscal Year then ended (a) as soon as practicable but in no event later than the date prescribed by applicable law, such information as shall be necessary for the preparation by the Member of a federal income tax return, state income or other tax returns with regard to each jurisdiction in which the Company does or is qualified to do business, and (b) within one hundred twenty (120) days after the end of each Fiscal Year, a statement of assets, liabilities and Members' capital, a statement of income and expenses, a statement of sources and uses of funds, and a statement of changes in Members' capital.

5.4    <u>Tax Matters Member</u>.

(a)    Appointment.  JR Hughes shall be the "tax matters partner" (within the meaning of Code Section 6231, to the extent applicable for taxable years beginning before December 31, 2017), and the "partnership representative" (within the meaning of Code Section 6223(a), as amended by the Bipartisan Budget Act of 2015 (the "BBA"), to the extent applicable for taxable year beginning after December 31, 2017) (the "Tax Matters Member").

(b)    Tax Examination and Audits.  The Tax Matters Member will be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, in its capacity as such and shall keep the Members reasonably informed of any such administrative and judicial proceedings, and will be authorized to expend Company funds for professional services and other expenses reasonably incurred in connection therewith.  Each Member agrees to cooperate with the Company and to do or refrain from doing any or all things reasonably requested by the Company with respect to the conduct of such proceedings.  Promptly following the written request of the Tax Matters Member, the Company, shall, to the fullest extent permitted by the Act, reimburse and indemnify the Tax Matters Member for all reasonable expenses, including reasonable legal and accounting fees, claims, liabilities, losses and damages incurred by the Tax Matters Member in connection with any administrative or judicial proceeding (i) with respect to the tax liability of the Company and/or (ii) with respect to the tax liability of the Members in connection with the operations or activities of the Company.  The Tax Matters Member shall not settle any administrative or judicial proceedings which would require a Member to pay any material amount of tax liabilities associated with such proceedings without such Member's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)    BBA Elections and Procedures.  In the event of an audit of the Company that is subject to the partnership audit procedures enacted under Section 1101 of the BBA (the "BBA Procedure"), the Tax Matters Member, in its sole discretion, shall have the right to make any and all elections and to take any actions that are available to be made or taken by the Tax Matters Member or the Company under the BBA Procedures (including any election under Code Section

14





6226 as amended by the BBA). If an election under Code Section 6226(a) (as amended by the BBA) is made, the Company will furnish to each Member for the year under audit a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment, and each Member shall take such adjustment into account as required under Code Section 6226(b) (as amended by the BBA).

(d)    Tax Returns and Tax Deficiencies. Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. To the extent that the Tax Matters Member does not make an election under Code Section 6221(b) or Code Section 6226 (each as amended by the BBA), the Company shall use commercially reasonable efforts to (i) make any modifications available under Code Section 6225(c)(3), (4), and (5), as amended by the BBA, and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended federal income tax return, as described in Code Section 6225(c)(2) as amended by the BBA, to the extent such amended return and payment of any related federal income taxes would reduce any taxes payable by the Company.

5.5    Tax Elections. The Board of Managers shall have sole discretion to make an election under Code Section 754 of the Code and to make such other tax elections as the Board of Managers may from time to time deem necessary or appropriate.

5.6    Members' Capital Accounts. The Company shall maintain a separate Capital Account for each Member in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), and this Section 5.6 shall be interpreted and applied in a manner consistent therewith. Each Member's Initial Capital Account balance shall equal the amount set forth in the Subscription Agreement between such Member and the Company.

# ARTICLE SIX
## OPERATIONS

6.1    Bank Account. All contributions of capital made by the Members, and all other funds received by the Company in connection with its business operations shall be deposited in separate bank account(s) bearing the name and Employer Identification Number of the Company (the "Account"). The Account shall be subject to the control of the Board of Managers. All invoices received by the Company and approved for payment by the Board of Managers shall be paid by checks drawn on the Account. The Board of Managers shall determine the authorized signatories under the Account from time to time, including the requirement of two signatures to approve payments, including payroll. No other funds, including funds of a Member, individually, shall be deposited into the Account.

6.2    Invoices. Neither Member shall make any charges against the Company for general and administrative expenses or overhead expenses for time which may be expended in connection with the Company, except as approved by the Board of Managers.

6.3    Equipment. All equipment ("Equipment") which the Board of Managers deems necessary for the Company may be purchased or leased (including the leasing of equipment from

15

  

either Member) at rates and terms to be approved by the Board of Managers. If the Company purchases Equipment, the Members may be required to contribute additional capital in accordance with this Agreement. The proceeds of the sale of any Equipment owned by the Company will be the funds of the Company.

6.4    Bonding. The Company may be required to furnish payment and performance bonds to customers. Each Member shall provide the necessary indemnification for issuance of such bonds, based on its Percentage Interest. If only one Member furnishes a bond, the other Member shall be liable to the Company and the other Member to the extent of its Percentage Interest of any resulting liability.

6.5    Additional Capital.

(a)    From time to time in its discretion, the Board of Managers may determine the additional amount of capital needed by the Company. Within ten (10) business days after written request by the Board of Managers, each Member shall pay its proportion, based on Percentage interest, of such additional capital contributions (each, an "Additional Capital Contribution"). Additional Capital Contributions may be required on multiple occasions.

(b)    In the event that a Member fails to timely pay its share of an Additional Capital Contribution or is in material default of any other obligations hereunder (a "Defaulting Member"), the remaining Member (the "Contributing Member") may contribute the amount due from the Defaulting Member, and upon such payment by the Contributing Member (the "Capital Loan"), the Company shall withhold such amount plus 8% interest per annum from any distributions otherwise due, or to become due, to the Defaulting Member from the Company, and shall remit such amount to the Contributing Member.

(c)    If, within thirty-six (36) months after the initial notice of the Additional Capital Contribution (the "Repayment Date"), the Defaulting Member fails to repay the Capital Loan plus interest, or if its share of distributions are insufficient to satisfy the Capital Loan plus interest accrued thereon, the Defaulting Member shall not have the right to participate on the Board of Managers or vote on any matters before the Board of Managers until such amounts are repaid to the Contributing Member. Further, after the Repayment Date and at the election of the Contributing Member, the Contribution Member may take an assignment of that number of Units owned by the Defaulting Member having a value equal to the Capital Loan plus all accrued and unpaid interest accrued therein. The value of the Units of the Defaulting Member shall be determined in accordance with the procedure set forth in Section 9.3 hereof.

6.6    Noncompetition and Non-solicitation.

(a)    Each Member and Manager agrees that he, she or it has and shall continue to have knowledge with respect to the Company, (ii) the Company would be harmed if such knowledge were used by such Member or Manager to compete with the Company, and (iii) it is necessary to afford fair protection to the Company from such competition by a Member or Manager.

(b)    During the period of each Member's ownership of any Units and Manager's service

16





as a member of the Board of Manager, and for a period of two (2) years thereafter, no Member or Manager shall, directly or indirectly, individually, jointly or as a partner, agent or otherwise: (i) solicit, divert, interfere with, or attempt to solicit, divert or interfere with the business of any clients or prospective clients of the Company, (ii) perform any services similar to those performed by the Company, or (iii) induce, directly or indirectly, any employee of the Company to terminate his or her employment with the Company.

6.7    <u>Confidential Information</u>.  Each Member and Manager agrees that all information, whether or not in writing, of a private, secret or confidential nature concerning the Company ("Confidential Information") is and shall be the exclusive property of the Company, subject to the terms of the License.  As used herein, Confidential Information includes but expressly is not limited to inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, client and vendor lists, and contacts at or knowledge of clients and prospective clients of the Company.  The Members and Managers will not disclose any Confidential Information to any person or entity other than the Members, Managers, Officers, and the Company's attorneys, accountants and authorized agents, or use the Confidential Information for any purposes without written approval by the Board of Managers.  All files, letters, memoranda, reports, records, data, sketches, drawings or other written, photographic, or other tangible material containing Confidential Information, whether created by the Members, Managers or others shall be and are the exclusive property of the Company to be used only in furtherance of the interests of the Company.

**ARTICLE SEVEN**
**DISPUTE RESOLUTION; INDEMNIFICATION**

7.1    <u>Good Faith Negotiation.</u>  All disputes arising in connection with this Agreement which cannot be resolved by the Board of Managers may be referred by either of the Parties to the Chief Executive Officers of each Member for settlement.

7.2    <u>Mediation</u>.  If the dispute cannot be settled amicably by such Chief Executive Officers within ten (10) days, either Member may submit the dispute to a mutually accepted outside mediator by written notice to the other Member.  Such mediation shall be concluded within sixty (60) days and shall be confidential and non-binding on the Member.

7.3    <u>Arbitration</u>.

(a)    If the mediation fails to resolve the dispute, or if mediation is not concluded within sixty (60) days, then either Member may refer the dispute to be resolved before a single arbitrator in accordance with the current Arbitration Rules of the American Arbitration Association ("AAA").

(b)    Within thirty (30) days from the date when a Member refers the matter to arbitration, each Member shall nominate its respective arbitrators and submit them to AAA for selection of an arbitrator unless the Members agree otherwise.  The place of arbitration shall be in

17





Chicago, Illinois.

(c)    Each Member will be allowed ninety (90) days after the appointment of the arbitrator to conduct written discovery and take depositions. Written discovery shall consist of and be limited to 25 special interrogatories, 15 requests for admission and 35 requests for production of documents. In addition to any pre-hearing conference(s), the arbitrator(s) will schedule an arbitration hearing at the arbitrator's(s) earliest convenience but no sooner than the expiration of (thirty) 30 days following the end of such ninety (90) day period.

(d)    The award rendered by the AAA arbitrator shall be final and binding on the Members, and judgment may be entered upon such award in any court having jurisdiction thereof. In no event shall this paragraph be construed as conferring upon any court authority to inquire into or review any such award on its merits.

(e)    The arbitrator shall not grant any punitive damages or any relief prohibited by or inconsistent with the terms of this Agreement. If the arbitrator exceeds his/her authority in the award, the Members agree to conform the arbitrator's award to strictly comply with this Article and with other relevant terms and conditions of this Agreement.

(f)    Pending resolution of any dispute, the Members shall continue diligent performance of this Agreement.

7.4    <u>No Consequential Damages</u>. In no event shall a Member be liable to the other Member for any incidental, special, consequential or punitive damages arising under or related to this Agreement, whether such liability is claimed to arise in contract, tort (including but not limited to negligence), strict or statutory liability, or otherwise. This consequential damage waiver excludes payment of consequential damages that are otherwise included as recoverable damages by third parties in an action.

7.5    <u>Indemnity by the Company</u>. Each Member, Manager, Chair and Officer (each an "Indemnified Party") shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member for any loss or damage incurred by reason of any act or omission performed or omitted by such Indemnified Party in good faith either on behalf of the Company or in furtherance of the interests of the Company and in a manner reasonably believed by such person to be within the scope of the authority granted to such person by this Agreement or by law, provided that such person was not guilty of gross negligence, willful misconduct or any other breach of duty with respect to such act or omission. To the fullest extent permitted by law, Indemnified Parties who in good faith rely on the opinions of counsel and other professional advisors shall, to the extent their actions are consistent with such opinions, be deemed not to be guilty of gross negligence, willful misconduct or any other breach of duty with respect to such act or omission. To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Indemnified Party who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Company), by reason of any act or omission or alleged act or omission arising out of such Person's activities as an agent of the Company if such activities were performed in good faith either on behalf of the Company or in

18

  

furtherance of the interests of the Company, and in a manner reasonably believed by such person to be within the scope of the authority conferred by this Agreement or by law, against losses, damages, or expenses for which such person has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by such person in connection with such action, suit or proceeding so long as such person was not guilty of gross negligence, willful misconduct or any other breach of duty with respect to such acts or omissions, and, with respect to any criminal action or proceeding, and had no reasonable cause to believe its conduct was unlawful and provided that the satisfaction of any indemnification and any holding harmless shall be from and limited to Company assets, and the Members shall not have any personal liability on account thereof.

## ARTICLE EIGHT
## DISSOLUTION AND TERMINATION

8.1     <u>Events Causing Dissolution</u>.  The Company shall be dissolved and its affairs wound up upon the earlier to occur of:

(a)     the sale or other disposition of all or substantially all of the Company's assets, unless the disposition is a transfer of the Company's assets in return for consideration other than cash and the Board of Managers determines that the Company should not be dissolved;

(b)     the unanimous decision of the Board of Managers to dissolve the Company;

(c)     the termination of the License; or

(d)     the occurrence of an event specified under the laws of the State of Delaware as one effecting dissolution, except that where, under the terms of this Agreement, the Company is not to terminate, then the Company shall be immediately reconstituted and reformed on all the applicable terms, conditions, and provisions of this Agreement.

8.2     <u>Procedures on Dissolution</u>.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company shall have been liquidated and distributed as provided in Section 0 and the Certificate shall have been canceled.  Notwithstanding the dissolution of the Company, the business and the affairs of the Company shall be conducted so as to maintain the continuous operation of the Company under the provisions of this Agreement.  Upon dissolution of the Company, a Manager or, if none, a liquidator elected by the Board of Managers, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as provided in Section 0, and cause the cancellation of the Certificate.

## ARTICLE NINE
## PURCHASE RIGHT

9.1     <u>Call Right</u>.  Each Member has the right (the "Call Right") to purchase all of the Units owned by the other Member (the "Called Member") upon the occurrence of any of the following events:

19





(a)    the Bankruptcy of the Called Member or any Person who owns more than ten percent (10%) of the equity interests in the Called Member;

(b)    the acquisition of the Called Member by another Person by means of any transaction (including, without limitation, any reorganization, merger or consolidation or stock transfer);

(c)    the sale of all or substantially all of the assets of the Called Member, or a change of ownership of twenty percent (20%) or more of the equity of the Called Member;

(d)    the Called Member or any Person who owns equity interests in the Called Member commits an act constituting Cause, or otherwise breaches the material terms of this Agreement or the License;

(e)    the attempted Transfer of any Units in violation of the terms of this Agreement, whether voluntarily, involuntarily or by operation of law; or

(f)    any time on or after the tenth anniversary of this Agreement.

A Member shall exercise the Call Right by sending a written notice to the Called Member (the "Call Right Notice") that states that the Member is exercising the Call Right for all, but not less than all, of the Units owned by the Called Member.  The purchase price for the Called Member's Units (the "Called Units") shall be determined and paid in accordance with Sections 9.3 and 9.4 of this Agreement.

Section 9.2    Call Right Closing.  The closing of the purchase and sale of the Called Units (the "Closing") shall occur on the date mutually agreed by the Members at the offices of the Company.  If the Members are unable to agree on the date of the Closing, the Closing shall occur on the sixtieth day after the date of the Call Right Notice.  If such date falls on a weekend or holiday when banks in Chicago, Illinois are closed, the Closing shall be the next business day.

9.3    Purchase Price.  The purchase price for the Called Units (the "Purchase Price") shall be equal to the Value of the Called Units, in the Call Right Notice.  If the Called Member disagrees with the Purchase Price stated in the Call Right Notice, the value of the Called Units shall be determined by appraisal in accordance with the following procedures:

(a)    The Called Member shall engage an appraiser to determine the fair market value of the Called Units (the "Value").  If the Called Member's appraiser determines a value of the Called Units that is within ten percent (10%) of the value stated in the Call Right Notice, the Value shall be the average of the appraised value and the value set forth in the Call Right Notice.

(b)    If the appraised values are not within ten percent (10%) of each other, appraisers named by RNA and Centerline shall jointly agree on a third appraiser to independently value the Called Units.  If the appraisers selected by RNA and Centerline





cannot agree on the selection of a third appraiser within ten (10) days, either party may petition a court of competent jurisdiction for the judicial determination of the selection of an appraiser.

(c)    The Value of the Called Units shall be the average of the fair market values determined by the two appraisers whose valuations are closest in amount.

(d)    Each Member shall pay the expenses of its appraiser, and the Members shall divide equally the expenses of a third appraiser, if necessary.  Each Member shall cooperate with the appraisers and will provide any information reasonably requested by the appraisers in a timely manner.

9.4    Payment.  At the Closing, the Called Member shall assign the Called Units to the other Member in exchange for the Purchase Price.  At its sole option, the Member may pay the Purchase Price in immediately available funds and/or in five (5) equal installments with the first such installment due on the Closing and the remaining installments evidenced by the delivery of a promissory note (a "Note") that provides for four equal, annual payments of principal and interest, with the first installment due one (1) year after the Closing.  Simple interest shall accrue on the principal balance of the Note at a rate per annum at one hundred percent of the applicable federal rate.  The Member may prepay any amount owing under the Note in whole or part at any time. The Note shall be unsecured, and shall contain such other customary terms for a commercial note delivered in similar circumstances, subject to any requirements of such Member's principal lender as to reasonable and customary subordination provisions.

9.5    Drag Along Sale Rights and Obligations.

(a)    If RNA desires to accept an offer for the Sale of the Business from a Buyer, RNA may give written notice of the proposed sale (a "Sale Notice") to Centerline.  The Sale Notice shall specify the identity of the Buyer and the material terms of the proposed Sale of the Business (the "Sale Terms").

(b)    RNA and Centerline shall be deemed to irrevocably agree to participate in the Sale of the Business on the Sale Terms (including, without limitation, indemnification obligations and noncompetition and other restrictive covenants) as they are finally established, and to have appointed RNA as Centerline's attorney-in-fact for purposes of negotiating the Sale Terms with the Buyer in good faith.

(c)    RNA and Centerline shall take all steps in a timely and complete manner as may be requested in the Sale Notice or any subsequent notice from RNA to effect the Sale of the Business. These steps shall include, without limitation, voting all of the Units in favor of the Sale of the Business, tendering Units for Transfer and entering into such other purchase and sale agreements and other documentation necessary to effect the Sale of the Business pursuant to the final Sale Terms.

**ARTICLE TEN**

21



## MISCELLANEOUS

10.1    Governing Law.  This Agreement shall be construed and governed by the laws of the State of Delaware.

10.2    Notices.  All notices required under this Agreement shall be (a) made in writing; (b) delivered (i) in person or (ii) to the address set forth on Schedule 1; and (c) deemed received (i) if delivered in person, on the date of personal delivery, or (ii) if sent by overnight delivery, on the day after so sent.

10.3    No Waiver.  Neither the failure nor any delay by any Member in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any right, power or privilege will preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.

10.4    Entire Agreement.  This Agreement, together with the License, constitutes the entire statement of the agreement between the Members with respect to the subject matter hereof.

10.5    No Assignment.  Neither Member may assign any of its rights under this Agreement without the prior consent of the Board of Managers. This Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the Members.

10.6    Time of the Essence.  Time is of the essence of this Agreement.

10.7    No Agency.  This Agreement shall not constitute either Member as the legal representative or agent of the other, nor shall either Member have the right or authority to assume, create or incur any liability or obligation, express or implied, against, in the name of, or on behalf of the other Member, or the Company, except as provided by this Agreement.

10.8    No Compulsion.  Each Member warrants that such Member has read this Agreement, understands its contents, has freely and voluntarily entered into the same after having received legal advice from legal counsel of its own choosing as to its rights hereunder, and has not been influenced by any representation of any party or person or persons acting for or on behalf of any of the other parties hereto.

10.9    No Promise of Employment.  This Agreement is not a promise of continued employment with the Company on the part of any Member or the equity owners of any Member. Each employee of the Company remains an at-will employee, and the Company may terminate the employment relationship at any time, for any reason.

10.10    Letter of Intent.  RNA and Centerline are parties to that certain Letter of Intent dated February 24, 2021 (the "LOI"), the terms of which are incorporated herein and are binding on the Members.

22

  

[Signatures Appear on the Following Page]

IN WITNESS WHEREOF, the parties hereto have caused this Operating Agreement to be executed as of the date set forth above.

**RIEDER NORAM, INC.**

By: Wolfgang Rieder
    C6AE7EC40A71498...

Its: MD Rieder Noram Inc

Date: 28-08-2021

**CENTERLINE ARCHITECTURAL SUI...**

By: JR Hughes          Kyle Czekalski
    7BD8E20B3FD9430...   4412E05660D7480...

Its: Owner          Owner

Date: 30-08-2021     30-08-2021

23




# OPERATING AGREEMENT OF
# RCL SERVICES, LLC

### Schedule 1

### Definitions

For purposes of this Agreement, the following terms shall have the following meanings:

"Act" means the Delaware Limited Liability Company Act.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or other period, after (i) credit to such Capital Account of any amounts which such Member is obligated to restore or is deemed to be obligated to restore as described in the penultimate sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i); and (ii) debit to such Capital Account of the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).  The foregoing definition is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means any entity controlled by, in Control of or under common Control of the subject entity.

"Agreement" means this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Bankruptcy" shall have the meaning assigned to such term by the Act.

"BBA" has the meaning set forth in Section 5.4.

"Book Value" means, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except that: (i) the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as such value is determined under this Agreement; (ii) the Book Value of all assets of the Company shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers at and as of the following times: (A) the acquisition of an additional or new interest in the Company by a new or existing Member in exchange for other than a de minimis Capital Contribution by such Member; (B) the distribution by the Company to a Member of more than a de minimis amount of any asset of the Company (including cash or cash equivalents) as consideration for all or any portion of an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) any other instance in which such adjustment is permitted under Treasury Regulations Section 1.704-1(b)(2)(iv) (e.g., in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company; provided, however, that adjustments pursuant to clauses (A), (B), (C), or (D) of this sentence shall be made if the Board of Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; (iii) the Book Value of any Company asset

24



distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and (iv) the Book Value of the assets of the Company shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m). If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (i) or (ii), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Buyer" means an individual or entity (or group of affiliated individuals and/or entities) who or which offers to purchase or purchases a portion or all of the business of the Company by way of a Sale of the Business.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with the Treasury Regulations Section 1.704-1(b)(2)(iv).

"Capital Contribution" means, with respect to a Member, the initial Book Value of any property (other than money) and/or the amount of any cash contributed by the Member to the capital of the Company, documented as described in Section 2.2.

"Cause" includes, but is not limited to, with respect to a Member or Manager, and, to the extent the Member or Manager is not a natural person, the equity owners of such Member or Manager: (a) such Person having committed any crime involving fraud, embezzlement, theft, dishonesty or moral turpitude, or any crime of any nature classified as a felony; (b) any misappropriation of assets of the Company or any of its subsidiaries or affiliates; (c) any material inability or refusal to perform, or breach of, duties as an employee, Officer or Manager of the Company, determined in the reasonable discretion of the Board of Managers, which inability, refusal or breach remains uncured thirty (30) days following the Company's written notice of the same, or (d) willful or prolonged absence from work, other than due to being Disabled.

"Certificate" means the Certificate of Formation of the Company filed on the Formation Date with the Secretary of State of the State of Delaware pursuant to the Act, as such Certificate of Formation may be amended or restated from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company Minimum Gain" shall have the same meaning as the meaning of "partnership minimum gain" set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"Control" means having the beneficial ownership, directly or indirectly, of the voting power to elect directors having a majority of votes that directors may cast (in the case of a corporation) or managers, trustees, agents or representatives performing a similar function (in the case of an entity that is not a corporation) or the power to otherwise direct management of such entity.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the federal income taxation depreciation, amortization or other cost recovery deduction allowable with respect

25

  

to an asset for such Fiscal Year or other period, provided, however, that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such assets for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

"Disabled" means, because of sickness or injury, a Person is unable to perform all of the substantial and material duties of his or her occupation or profession, and is not actually at work in any occupation or profession on behalf of the Company for a continuous period of at least one (1) year

"Dissolution Transaction" means a dissolution of the Company, or a distribution of proceeds from (i) the merger or consolidation of the Company into or with a Third Party Entity, or (ii) the sale, conveyance or lease of all or substantially all of the assets of the Company to a Third Party Entity. "Third Party Entity" means another entity except (i) any legal entity (other than a natural person) that directly or indirectly controls, is controlled by, or is under common control with the Company or (ii) any entity which, following the transaction in question, a majority of the voting equity of which is owned directly or indirectly by the Members of the Company prior to the transaction.

"Fiscal Year" means the fiscal year of the Company, which shall be a calendar year ending on December 31 of each year.

"License" means that certain License Agreement dated as of ____, 2021, between Parent, RNA and the Company.

"Member" refers to each of the Persons named as Members in this Agreement and any Person who becomes an additional or substitute Member as permitted by this Agreement, in each such Person's capacity as a member of the Company under the Act.

"Member Consent" means the consent of Members holding more than 50% of the total Units held by all Members.

"Member Nonrecourse Debt" has the meaning set forth for "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means "partner nonrecourse debt minimum gain" as defined in Treasury Regulation Section 1.704-2(i)(2) and (3).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as set forth in Treasury Sections 1.704-2(i)(1) and 1.704-2(i)(2).

26





"Net Distributable Cash" means, with respect to any fiscal period, the sum of all cash receipts of the Company from any and all sources, less the sum of the following expenditures paid out of such cash receipts: (i) payments of rent, insurance, real estate taxes, legal expenses, commissions, management expenses, utilities, repairs and maintenance, accounting and bookkeeping services, equipment, supplies, salaries, advertising and promotion, and any and all other items which are customarily considered to be "operating expenses"; (ii) payments of interest, principal and other charges with respect to any and all loans or other indebtedness of the Company; (iii) all expenses of borrowings by the Company including, without limitation, all commitment fees, broker's commissions and attorneys' fees; (iv) any amounts used for any purpose in order to satisfy conditions to or established in connection with such borrowings; (v) payments made to acquire or in connection with the acquisition, improvement, alteration or disposition of property of the Company; (vi) payments made in connection with the organization of the Company; (vii) any and all funds disbursed or to be disbursed (including amounts deducted for adjustments) in connection with or as an expense of the sale of property of the Company, including without limitation all brokers' fees and attorneys' fees; (viii) any and all other cash expenditures of the Company, except distributions to Members; (ix) Tax Distributions; and less (x) amounts set aside as additions to reasonable reserves established by the Board of Managers for working capital, contingent liabilities or for any of the expenditures described in Subsections (i) through (viii) above, or as otherwise deemed by the Board of Managers as reasonably necessary to meet the current and anticipated future liabilities, obligations and operating and capital expenditures of the Company.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"Percentage Interest" means, with respect to a Member, the number of Units held by such Member divided by the total number of Units held by all Members.

"Person" means any individual, company, corporation, joint venture, trust, business trust, cooperative, association, or other entity, and, where the context so permits, the legal representatives, successors in interest (including, without limitation, heirs) and assigns of such Person.

"Profits and Losses" means, for each year or other period, an amount equal to the Company's net taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments: (a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss; (b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or loss; (c) in the event the Book Value of any Company asset is adjusted in accordance with Paragraph (ii) or Paragraph (iii) of the definition of "Book Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for

27





purposes of computing Profits or Losses (d) gain or loss from a disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis; (e) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation for such Fiscal Year or other period; (f) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses); and (g) any items which are separately allocated pursuant to Sections 0 and 0 shall not be taken into account in calculating Profits and Losses.

"Sale of the Business" means sale of assets of the Company requiring approval of any voting group of the Shareholders pursuant to the Delaware Limited Liability Company Act, as amended, or any successor provisions of similar effect, or a sale of a majority or all of the Units in a single transaction or series of related transactions, a merger of the Company with or into any other entity or entities, any consolidation of the Company with any other entity or entities, or any substantially similar transaction

"Tax Distribution" has the meaning given it in Section 4.2(a).

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way (whether voluntarily, involuntarily or by operation of law) as to any interest as a Member.  Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetence, Bankruptcy, liquidation and dissolution.

"Treasury Regulations" means the Income Tax Regulations, including temporary regulations, promulgated under the Code, as amended from time to time.

"Unit" means an ownership interest in the Company, including the right to any and all benefits to which a holder of Units may be entitled as provided in this Agreement, together with the obligation of the holder of Units as Member to comply with all the terms and provisions of this Agreement.

  

## OPERATING AGREEMENT OF
## RCL SERVICES, LLC

### Schedule 2

| Member and Address | Units | Percentage Interest | Capital Contribution |
|---|---|---|---|
| RNA | 50 | 50% | |
| Centerline | 50 | 50% | |
| **TOTALS:** | **100** | **100%** | $_____ |




DocuSign Envelope ID: 2ED3039B-464C-4D53-9E8A-2EE5E2F2E06E

## Schedule 3

### Officers

The Board of Managers shall have the right to delegate authority to act on behalf of the Company to Officers elected from time to time by the Managers. The Company may, but is not required to, have as its Officers a Chair, a Chief Executive Officer, a President, a Chief Financial Officer, a Chief Operating Officer, one or more Executive Vice Presidents, one or more Vice Presidents, a Secretary, a Treasurer, and such other Officers as the Board of Managers may determine.

Except as may be otherwise provided by the Managers, a person holding the title of an Officer set forth below shall have the power and the duties set forth below:

Chair. The Chair shall preside over meetings of the Managers and perform such duties and possess such powers as are assigned to him by the Managers.

Chief Executive Officer. The Chief Executive Officer shall, subject to the direction of the Managers, have general charge and supervision of the business of the Company. The Chief Executive Officer shall perform such other duties and shall have such other powers as the Managers may from time to time prescribe.

President. The President shall perform such duties and obligations and have such powers as prescribed by the Managers and the Chief Executive Officer.

Chief Operating Officer. The Chief Operating Officer shall, subject to the direction of the Managers and the Chief Executive Officer, have general charge and supervision of the administration and daily conduct of the Company's business. The Managers shall designate the Chief Operating Officer. The Chief Operating Officer shall perform such other duties and shall have such other powers as the Managers and the Chief Executive Officer may from time to time prescribe.

Chief Financial Officer. The Chief Financial Officer shall, subject to the direction of the Managers, have general charge and supervision over the financial affairs of the Company. The Chief Financial Officer shall perform such other duties and shall have such other powers as the Directors may from time to time prescribe.

Vice Presidents. Any Vice President, including an Executive Vice President, shall perform such duties and possess such powers as the Managers may from time to time prescribe. In the event of the absence, inability or refusal to act of the President, the Executive Vice President, if one has been appointed, shall perform the duties of the President, and when so performing shall have all the powers of and be subject to all the restrictions upon the President.

Secretary. The Secretary shall perform such duties and shall have such powers as the Managers may from time to time prescribe. In addition, the Secretary shall perform such duties and have such powers as are incident to the office of the Secretary, including, without limitation,

30





the duty and power to give notices of all formal meetings of the Managers, to attend all such meetings, and keep a record of the proceedings, to maintain lists of Members and their addresses as required, and to be custodian of the Company records of meetings, actions, authorizations, and resolutions of the Managers and similar matters.  In the absence of the Secretary at any meeting of the Managers, the person presiding at the meeting shall designate a temporary secretary to keep a record of the meeting.

  <u>Treasurer and Assistant Treasurers</u>.  The Treasurer shall perform such duties and shall have such powers as may from time to time be assigned by the Managers.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of treasurer, including, without limitation, the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected by the Managers or an authorized Officer, to disburse such funds as ordered by the Managers or an authorized Officer, to make proper accounts of such funds, and to render, as required by the Managers or an appropriate authorized Officer, statements of all such transactions and of the financial condition of the Company.


